May it please the court, Casey Pitts from Altshuler-Berzon for petitioner SCIU Local 87. I'd like to reserve three minutes for rebuttal. In this case, the NLRB wildly misapplied board and judicial precedent in concluding that a group of workers violated the NLRA's ban on secondary boycotts by peacefully picketing on public sidewalk in front of the building where they worked. I will first explain why the workers' protests did not have any secondary target and then why their protest was not coercive as it must also have been to establish a violation of subsection 2 of section 8b-4. This court's agreement with our position on either issue requires reversal of the decision below. Finally, I will explain why these issues are properly before this court and have not been waived as the board contends. Subsection 2 of section 8b-4, which is the provision at issue here, has two related elements. First, a labor organization must be targeting its conduct towards a neutral secondary party. And second, it must be engaging in that conduct in order to coerce that neutral party into ceasing doing business with the primary subject of the union's dispute. The primary employer works at a site where there are also neutral secondary employers, which is known as a common situs. The board uses its Moor-Drydock standard to determine whether a union's protests at such a site are presumptively targeted the primary employer and therefore lawful. Here, it is undisputed that the first three prongs of the Moor-Drydock standard were satisfied. And the only issue under Moor-Drydock was whether the workers clearly identify the primary employer involved in their dispute. Here, the workers' signs were more than sufficient to satisfy that requirement. The sign said, preferred building services unfair, and preferred building services is the primary employer here. They also said, we are in a labor dispute with the cleaning contractor at this building. And they further emphasized that preferred was the target of their protests with the language about their actual underlying grievances, because they said, we prefer a living wage. We prefer no more sexual harassment. So even in talking about their underlying grievances and the sexual harassment they'd suffered at that site, they used the specific word preferred to emphasize that preferred was the target of their protest. Counsel, may I ask you to address the language of the handbills that were distributed? Because they said that they were employed by preferred, but they also mentioned KGO Radio. They said, we are calling on KGO Radio. Why doesn't, to do various things, why doesn't that support an inference that at least part of the target of what they were doing was the KGO? Because they made it very clear, they were absolutely crystal clear in the first line of that handbill did say that the workers work for preferred building services, which cleans the offices of KGO Radio. So there was no dispute whatsoever, contrary to what the board said about their status as employees, their employment status. The board held that their use of a single pronoun there in that handbill created some ambiguity, but the handbill itself was very clear about the nature of their relationship, lack of relationship with KGO and their relationship with preferred. Now, why did they mention KGO at all? Because they had a First Amendment right to say that they were certainly hoping that their message would be heard by KGO Radio and others. They had a First Amendment right to do that. It's very clear under DiBartolo that they have a right to handbill for the purpose of communicating facts to the neutral tenants of a site. In fact, DiBartolo says that they could have handbilled requesting a boycott. Now, they weren't doing that here. It was very clear there was no request for a boycott whatsoever. So they had a right to say that they did think as a First Amendment, you know, in their view, it was appropriate to say that KGO Radio may be concerned about sexual harassment that's taking place in its offices by the people who are against the people who are cleaning its offices and that they were communicating to KGO Radio. But they had a right to do that that didn't change the target of their picketing, which was very clear that they had a dispute with preferred building services, and that's what they were protesting was their conduct by preferred building services. This goes to some extent to the way in which the first element, the secondary element, is related to the secondary element, because the second coercion element, because the question is not just are they trying to speak to some entity, but it is are they targeting coercive conduct towards a secondary party. And here it's very clear there's no effort whatsoever to coerce KGO Radio into doing anything so there is no evidence to suggest that they were a secondary party here. And why, I mean, since you moved to coercion, I mean, the ALJ seems to have regarded this as coercive picketing. The Board of General Counsel did not file an exception to that. You didn't file exceptions. Why is the argument that you are now making challenging that finding? Why has that been First, under this court's decision in Gardner, the question is just whether the issue was properly before the board in order for it to come before this court. And the issue here was whether the workers' protests violated Section 8 before, and there was no question that that issue was fully litigated below. And even if there were some requirement for exhaustion, the motion for court's decision in Wolpe and Romero framing, they, in that case where they found that an issue hadn't been properly raised, the Supreme Court specifically said a motion for, identified a motion for reconsideration as the proper method. But the final point I would make on this is that the ALJ did find really as a legal matter, it's a legal determination I would say rather than a factual matter, that this picketing was coercive solely because it involved, it was ambulatory and it had, and there were signs involved. The ALJ then went on to say, but it does, to find that the secondary target element was not satisfied because there was no request for a boycott and because it was purely informational. So, you know, that, that is the line that we are now saying as a legal matter, distinguishes coercive picketing from non-coercive picketing. So in some ways, the ALJ, I would say put that issue in the wrong box, but if she did properly recognize that those facts precluded a finding of a Section 8B4 violation, and there was no more reason to accept to that finding because she was correct in recognizing that where workers are not calling for a consumer or supplier boycott or a work stoppage of any kind, and there is, and are engaging in purely informational picketing, that is protected picketing that is non-coercive. Can I ask you, counsel, so the, I just want to make sure I understand the line that you said you're trying to draw between coercive and non-coercive conduct. I assume that you would find it, that it would be problematic if the workers here and the, and the other union members were picketing in such a way that they were obstructing the ability of people to come in and out of the building, right? Even if they weren't calling for a boycott per se of any of the tenants or, or, or even the building itself, if they were in some way obstructing ingress and that would cross the line into coercive conduct, wouldn't it? They were intentionally obstructing egress and ingress in a way that, that couldn't be addressed. You know, the facts of the matter in this case, as I understand it, is no one, no one raised that concern that there wasn't a request by the building, for example, that they go out and create, move their protests in a way that would create a space. You know, there was no claim that they were somehow violating the building's rules or creating such, such a block. So I don't think that's presented. I do think, you know, so those aren't the facts that are, that are drawn here, I think, but I do think it is clear that the Supreme Court's decisions in Safeco and TreeFruits make it clear that some picketing falls on the non-coercive line for purposes of section, subsection two. And here, you know, and the court in, in TreeFruits, I don't specifically focused on the extent to which anyone was blocked from getting into or out of the market at that place. You know, if, if there were evidence in the record, that might be relevant to, to the coercion issue, but I don't believe that evidence was produced here. Well, just state again, because I missed it the first time, how would you have us articulate the line between coercive and non-coercive picketing? So the court in Safeco essentially says that picketing is coercive where it is, it calls for a consumer or supply, supplier boycott of the entirety or almost all of the business that's being picketed. So in that case, by calling for a boycott of all of the insurance goods that were being sold by the secondary party, that was, that, that became coercive in its nature and, and a group standing outside of a business calling for a boycott, entire boycott of the business could be conceived of as intimidating. Tree fruits demonstrates the other side of the line that there was ambulatory picketing in tree fruits, but because the request was simply that people boycott a particular good that was being sold by the supermarkets. In that case, it was non-coercive and the court held that section eight before should not be construed to apply to that conduct. It's not, it's peaceful, expressive picketing. And, and that, that principle applies with even greater strength here, where there wasn't even any call for a boycott of the businesses whatsoever. They were very clear that it was an informational picket. There was no call for a boycott. In fact, their purposes would be achieved only if the people who heard their message entered the building and conveyed their concerns about the sexual harassment that was occurring. Customers coming to this building for these, these neutrals. That's not in the record, but these are the neutrals that have been and their customers would not be people that would be reached in person. Now, you know, we wouldn't deny that there are some people who enter and leave a radio station's offices as otherwise, but certainly if the effort was to affect KGO radio's business, this would have been a particularly poor way to do it, given the nature of what KGO radio was engaged in. Can I bring you back to Moore Dry Dock for a second? I just wanted to ask, am I right that the Moore Dry Dock factors basically just set up a presumption anyway, and we would need to look at the totality of circumstances? And if so, should we even bother with the Moore Dry Dock factors here or just look at the totality of circumstances? Both the courts and the board have recognized that Moore Dry Dock is useful as a starting point in evaluating the union's conduct. And here, the Moore Dry Dock standards were satisfied, especially if one focuses on the question, as I said, that they couldn't have been clearer that pervert building services was the target. So that creates a strong presumption that their conduct was lawfulness, and there was no evidence in the record that would overcome that presumption, let alone strong evidence strong enough to overcome the presumption. So I think it's worth considering the presumption that Moore Dry Dock creates as an evidentiary matter, but that is a conclusion that is strengthened if one goes to look at the rest of the record. Unless the court has further questions, I'll reserve the remaining time for rebuttal. Okay, very good. Let's hear from counsel for the board. May it please the court. Kelly Isbell here on behalf of the National Labor Relations Board. The employees had a dispute with their employer, Ortiz Janitorial. I'm sorry, can you hear me? I just turned up my volume. Now I can. Okay, I'll turn up mine as well. Maybe that will help. The employees had a dispute with their employer, Ortiz Janitorial. Still, can you hear me now? Okay. They picketed outside the building where they work twice. That picket included patrolling with them. In addition to picketing, they handed out handbills. Those handbills called on a neutral tenant, KGO Radio, to take corporate responsibility for its janitors and ensure that they receive higher wages and improved other conditions of employment. In meshing a neutral employer in a labor dispute is exactly what is prohibited by Section 8b-4. If you combine that with coercive activity, like a picket, with patrolling with signs in front of a building entrance, that is the definition. Why is that on its own deemed coercive? That I don't understand. Well, let me address first the 10e issue, the issue about coercion and the fact that it's barred here. I mean, the board, the ALJ made a specific factual finding, a legal conclusion actually, based on the fact that this picketing was coercive in terms of Section 8b-4. No one challenged that before the board. And under the board's rules, that cannot be raised now. So everything that's going to be raised to the board or in proceedings thereafter has to be raised at the appropriate time. And under the board's rules, 29 CFR 102.46, you have to raise it in your exceptions or cross exceptions. So is it your view that raising it in the motion for reconsideration was inadequate to exhaust? Yes, your honor. The motion for reconsideration under the board's rules is there for raising issues that are extraordinary, or you've identified something like a material error in the board's decision. That's what Wilkie versus Romero framing is about. If the board does something sua sponte or there's something extraordinary, you can raise it in a motion for reconsideration. But for issues that should have been raised to the board that the board needs to take a first crack at, you need to raise it to the board. And there was nothing extraordinary about the coercion finding. It didn't come late. It didn't come after the board's decision. I'm sorry. If you look at the denial of the motion for reconsideration, the union has said in its brief that the board denied that motion on its merits. In fact, what the board said, it's executive record number one, I believe, that the union identified no extraordinary circumstances and no material error that would require the board to re-look at that finding. So that's why it's not before the board at the decisional point of the board, and it's not before the court now. Well, I guess I just, I don't understand the rationale for that rule, though. In the context of a case where somebody has prevailed at the ALJ level, does the board really want, you know, points that might, that from the winning party standpoint are immaterial to the outcome, just to preserve the ability maybe, you know, three years later to raise the point before our court? That just seems like a really inefficient rule to set up. I'm not sure government efficiency is something we actually need to get into, but here, yes, board wants the issue raised. And the, remember the eight before finding was raised by preferred. Preferred, they didn't discuss coercion because every, the general counsel didn't disagree with the coercion finding. The general counsel acquiesced on that finding, and the general counsel did file exceptions in this case and could have accepted to that finding and did not. Preferred discussed the eight before finding. So everyone was on notice that this was a case that was about secondary picketing. Coercion is an essential element of an eight before to be finding. There is no question under the act or this court's or the Supreme Court's decisions. Coercion is an essential finding, and the general counsel did not accept to that, Your Honor. I, yeah, I understand that. But, you know, the union at that point is on the sidelines. It's not directly a party to the proceeding. It certainly could have participated, I gather, if it had wanted to, but there was no reason for it to. Its position had prevailed in the proceeding. It's relying on the general counsel to continue to prosecute the case before the board. It makes no sense for the union at that point to jump in and say, oh, well, we have these additional exceptions, board, that we'd like you to consider, even though, you know, we prevailed. I just don't see why. That seems like a crazy rule to set up when the motion for reconsideration part of it, that does make sense. If that's an important issue that the board does need to address, it's given the opportunity to do so then. It could have revisited the issue then if it wanted to. Right, but the board's rules are long-standing, and the party, the union relied on the general counsel to make its case for it, and the general counsel decided not to accept to that. I mean, that was a finding that went against the union. If someone disagreed with that finding, it should have been raised at the appropriate time. I mean, these rules are not, they're not new. They've been around for a very long time, and no one discussed the issue of, challenged the issue of coercion in any of the filings after the, to the ALJ or afterwards. There was no discussion in exceptions or cross exceptions or reply briefs or answering briefs. Everyone accepted that this was a coercive picket, and we sent in the video of this picket. I'm not sure on what basis we would find this picket not to be coercive. They were merely... Let's address the point then on the merits. Assume we disagree with you on the Tenney issue. Why is, yeah, why is it coercive? Because all I see are people who are not trying to obstruct, it's not like they're trying to block the entrance so that the building, in effect, would be boycotted, you know, and put pressure that, let's say, on Harvest to try to come to the union's side of things. They're out there trying to communicate a message, and they're doing so in a peaceful way. It's loud, no doubt about that, but I didn't see any aggression toward people who were trying to come in and out. I didn't see any sort of implicit threats of violence involved. So why is it, you wanted us to hold that the mere presence of people walking around in a circle and chanting is just inherently coercive, and I guess I'm having trouble with that concept. Well, I don't think that's at all what we're arguing, but I think that this case, and other cases where there has been picketing, picketing is not just plain speech. It is speech plus conduct, and you have patrolling and chanting and drumming and the use of a megaphone. There's no finding either way whether or not they blocked the entrance. I'm not sure on these facts there has to be. But they're also not preventing customers of KGO from interacting with KGO. I mean, this isn't a typical kind of business where customers are coming and going and the picket could get in the way. So I have trouble understanding why the picket itself is such a problem for the building here. Well, let me first say that we don't actually know all the names of the businesses in this building. We know that Handbills particularly targeted KGO Radio, but there's nothing in the record. Maybe there was a newsstand at the bottom or a sushi lunch place at the bottom of the building. We don't actually know that, but I don't think it's relevant. The issue here is the union's intent and whether or not the union evinced an intent or showed an objective to interfere with the business There doesn't have to be a call for a boycott. The word boycott is not in Section 8B42B. That is not actually what we're looking at here. But you're going back now to secondary object, right? Or did we just switch away from coercion to secondary object? Am I following you? I think I did, Your Honor. Okay, so can I ask you a question about that then? Because I think when you started talking about that, you said that the fact that the made it improper, but I thought that County Concrete said otherwise. So could you address County Concrete? Well, handbills by themselves are not a violation of 8B42B, right? So it is the combination of coercive activity, here the picketing, combined with the handbills. Once you have those two combined, and that's under DiBartolo and a board case that's Local 737, handbilling unaccompanied by picketing, not coercive. Handbilling accompanied by picketing, then... Okay, now you jump back to coercion. I'm asking about... Could you go back to whether the first question in the case, the more dry dock and totality of the circumstances issue, not the coercion issue? Yes. I'm sorry, I was trying to address whether or not handbills on their own would meet the requirements here, and they do not. So more dry dock. More dry dock is an evidentiary tool that the board and the courts use to decide whether or not activity is coercive secondary activity. The board goes through the four factors, and it looks at the totality of the circumstances. This is accepted by the board and by this court. All of the evidence is relevant, and more dry dock is not a per se rule. Right, and wouldn't... Okay, so starting with more dry dock, wouldn't any observer of this protest understand that they were employed by Preferred and were protesting Preferred? The handbills made it ambiguous. The handbills they were giving to passers-by named KGO Radio and asked KGO Radio to get involved. They said who the employer was. They said the employer was Preferred. We are now assuming that Preferred and Ortiz were joint employers. The ALJ made that finding. The board assumed it but did not make a finding because it didn't need to because KGO Radio was involved as a neutral here. So the board did not literally make a finding that Preferred was the employer of these employees. Okay, but why does that matter? So my point is that the statements by the protesters were about Preferred, and they said specifically that they were employed by Preferred, and that the conduct that they were upset about was done by Preferred. So they did invoke a request for help from other entities, but it's pretty clear, I think, to anyone observing who their employer is. So how do you get past the fourth more dry dock factor? The handbills, once the handbills are given out at the protest, the handbills become the same course of conduct. And what statement in the handbills makes confusion about who their employer is? We call on KGO Radio to take corporate responsibility for their janitors to ensure that they receive higher wages and some other dignity and respect on the job, other terms and conditions, and to join us for a picket outside the offices of KGO Radio. But it all is preceded by explaining who their employer is and that their employer is Preferred. It is all happening at the same time, Your Honor. But the handbill itself starts with who their employer is, right? That's the first sentence, and then it goes on to name KGO Radio twice or three times, depending on the handbill. And why doesn't County Concrete tell us that it's okay to name KGO Radio? Because you cannot enmesh a secondary neutral employer in your dispute with the primary. They are asking KGO to get involved in this dispute. And they also, remember, But isn't that exactly what happened in County Concrete also? Your Honor, I am blanking on exactly what happened in County Concrete. My apologies. Could I ask you a different board decision? General Maintenance Company seems to have some similarities to this case in that there was handbilling by janitors that mentioned, you know, there was, I think, the building manager. And I read the board's analysis there as suggesting that simply passing out handbills as, you know, part of a campaign that mentions the manager is not unlawful. I mean, there was other stuff. They entered the building and threw trash, and the board said that was unlawful. But doesn't the analysis of that decision suggest that this sort of handbilling, you know, even if you mention or, you know, call on the non-employer to do something, that that itself doesn't demonstrate an unlawful secondary motive? And that, I believe, is the larger point here. There are several ways to make this a lawful protest, and one of them is to hand out handbills. Under DiBartolo, the handbills are not unlawful. It's the handbills combined with the picketing, the handbills plus coercion under 8B4 that makes it unlawful. But it's not handbills plus coercion. It's handbills with an improper secondary motive plus coercion. And my point was, I thought that, you know, both County Concrete and also general maintenance companies suggest that you can't infer an improper secondary motive, just from the fact that you mention the, you know, somebody other than the employer, as long as you're making it clear that our dispute is with the employer. So can you address that? Yes, please. Thank you. It depends on the entire, the totality of the circumstances, right? So here we have not only the language on the handbills, we have the other independent evidence that the board relied on, and that includes a meeting with the building manager, where they told the building manager they would continue to picket until they raised their wages. Well, they didn't say until he raised the wages. I mean, he said, they told us we'd keep picketing until we raised the wages, which in context, I thought it was not clear who we was there. I think it was clear in the context of the entire meeting. The meeting started with the union telling Mr. Maxson it was inappropriate that Mr. Ortiz was still on site. And why is that inappropriate, given that he was sexually harassing the workers? Harvest was not, Harvest did not control him. They were making a request that was their employer. Their beef was with Mr. Ortiz. Harvest was not their employer. That's what makes it secondary. But Harvest asked them what's going on. And so they told them what's going on, but their complaint was against preferred. They were clear about that to the people on the sidewalk and to the people inside the building. So isn't that exactly not a secondary purpose? The union has said that in that meeting, they told Maxson they would continue to picket until preferred raised their wages. That is not what I read from Mr. Maxson's testimony. Mr. Maxson's testimony was they said they would continue to picket until we made changes specifically to their wage. That is very different than saying we want preferred to make changes. I think that brings us back to county concrete, but it seems like we can't discuss that. So, well, my apologies. With I don't want to flip through my papers with you here. It is in my brain. If you give me two facts from it, I will be able to pull it out. I mean, that's the case where they the issue was they wanted higher wages and the higher wages could have been achieved by the direct employer or by some kind of involvement. By the neutral and the board said this isn't this isn't an improper purpose. Here they have the radio. So let's assume Harvest can do something. KGO radio can't do anything to raise their wages except put pressure on their actual employer. That's what makes it secondary. KGO radio has no authority over their direct work conditions. Harvest technically, I suppose, could raise their wages by increasing the price of the contract. But that is not. They are so far removed that asking Harvest to provide an increase in wages is not the same as discussing it with your direct employer. It's not the kind of contract. In county concrete, there was a discussion between the superintendent and the union agent about whether the secondary employer could help by supplementing the wages. And that was still not improper. And in that case, I don't believe that's a construction case. And it's not like this case where they're too it's too far removed. And we've got KGO radio in here. There is no there's no relationship here, as there might be between a general contractor and a subcontractor where the general contractor has control. Is that basically saying that the janitors can never protest their conditions? Absolutely not, Your Honor. But aren't janitors always going to be, at least almost always, cleaning for some other entity? I mean, usually they're employed by a different entity than they're cleaning the offices of. So I think you're arguing that just because KGO is somehow not really directly involved in employing these janitors, the janitors can never picket. Oh, absolutely not, Your Honor. Absolutely not. If the handbills had not been given out at the picket, we would then have a question whether or not preferred is the joint employer and the board would have had to make that finding. But that's not an issue that anyone is contesting at this point, right? If you disagree about the handbills and you find that only the picket signs are relevant, then the board has to decide whether or not preferred and or T's are joint employers. So to the question of lawful protest, if the picketing had happened, we're going to assume joint employers. I'm sorry, maybe I'm just forgetting, but did your briefings ask us to decide that they're not joint employers? No, that is the board assumed that they were joint employers because it found that they were the union was targeting KGO radio. It did not need to reach the issue of joint employers. So are you just saying that if we think you lose, you get a remand? What specifically what I'm saying is that if you disagree that the entire course of conduct included the handbills and the picket signs and the independent evidence requesting Maxon to take some. If you disagree that there's an entire course of conduct and you're only looking at the picket signs, then I'm afraid the board needs to decide whether preferred is an employer of these janitors. To go back to Judge Friedland's question from a minute ago, is your answer that janitors to have some dispute with the contractor who employs them at the offices of someone else can picket, but they can't pass out handbills that mention who the someone else is? Is there ever a situation where they'd be legally able to do that under your view? I'm sorry, I had started and then I lost my, where I was going. No, your honor, the picket signs, we're going to assume preferred is their employer. Picketing as they did with no handbills, lawful. The handbills targeting KGO, targeting Harvest, without the additional coercion of the picket, that's under DiBartolo. That would have been lawful. I mean, the issue in 8B42B is the connection of the two things. Does that answer your question, your honor? There were several ways this could have been a completely lawful picket or handbilling situation. Janitors are not precluded from either peacefully protesting or informing the consumers and the public of their dispute with their employer. What if they had the pickets and the handbills together, but the handbills simply said, first paragraph was the same. And then the second paragraph was, in order to inform you about what the situation here is, please be aware that, although we work for preferred, we're actually cleaning the offices of KGO, but we were just mentioning that for informational purposes and don't want you to do anything about that. Would that be okay? Is it the implicit call on KGO to do something that makes it improper, on your theory? In this case, it was the explicit call on KGO radio to do something. I mean, I've thought about this hypothetical in terms of you're directing people to the picket line. So you put the address and maybe say, this is the offices where KGO. I'm not entirely sure, your honor. The issue here was they spent much more time on those handbills talking about KGO than they did preferred and Ortiz was never mentioned. How do you say that based on the language of the handbills? What I mean, it starts out the very first sentence about preferred. How do you say that there's more language about KGO in the handbills? I think that's just false. It moves on to KGO. It mentions KGO radio twice, sometimes three times. Preferred in the first handbill is mentioned once, I believe. I think we've taken you well over your time. Unless my colleagues have further questions, maybe let's rebuttal. Okay, thank you for your argument. How much time is left for rebuttal? Okay, you're in good shape. Thank you, your honors. If I could start by addressing the meeting that occurred with Mr. Maxson. As you noted, that does not provide evidence to overcome the presumption of lawfulness here. The one statement the board identified was ambiguous at best. And it's significant that Ms. Squarey, the director of preferred, was in fact at that joint employer to take the actions that were requested. And it is entirely permissible under this court's authorities and under the board's own authorities for an entity that is engaged in picketing to inform others at a common situs why it is picketing and what will end the picketing. And that's entirely protected and permissible. Nothing in that meeting overcomes the strong presumption of lawfulness that attaches here because there was a compliance with more dry dock. And similarly, I think with respect to the board's attempt to rely on the handbills as evidence of a secondary purpose, it's significant that under DiBartolo, the union actually could or the workers actually could have specifically asked for a boycott in those handbills of a secondary party to pass with DiBartolo Hells that you can handbill requesting a boycott of the entity near whom you are passing out those handbills. But they did not do that here. It's very clear they didn't do that here. But they did have that right. They didn't exercise that right. And all of this in some ways goes to the inferences that the board is trying to draw from the sparse evidence here. And I think as the cases that you've decided that you've mentioned already note, as well as other Ninth Circuit decisions holding that the unions can't be required to specifically say they'll comply with more dry dock and that it's sufficient to say that to inform neutrals about their picketing and even more fundamentally, the Supreme Court's decisions in DiBartolo and Tree Fruits and this court's decision in Overstreet all provide guidance to the kind of inferences that cannot be drawn. And in fact, the opposite principle needs to apply in this context with respect to whether you find a violation of Section 8B4 in conduct that indisputably is expressive conduct protected by the First Amendment. And finally, I'd like to address the joint employer issue. It is true that it was not raised below. Notably, Preferred has intervened in this court in this proceeding and did not challenge the joint employment finding in its brief to this court. I think that's because the evidence was overwhelming that Preferred was actively engaged in hiring, firing, supervising, discharging and disciplining the workers who worked for OJS. And so that's sufficient to satisfy any standard of joint employment. And, you know, if this court were to agree with our position on the coercion prong of Subsection 2, then the joint employment issue actually would not be relevant because whether Preferred was a whether they were targeting Preferred or not wouldn't matter because they hadn't engaged in coercive conduct. So it really is only relevant if the court finds the secondary prong dispositive. Okay, thank you very much. Thanks to both counsel for your helpful arguments in this case. The case just argued is submitted and we are adjourned for this session.
judges: Watford, Friedland, Miller